**In re LOWER MERION TOWNSHIP FIRE DEPARTMENT LABOR STANDARDS LITIGATION.**

Civ. A. No. 96–8036.

United States District Court, E.D. Pennsylvania.

Aug. 5, 1997.

John C. Fekety, Philadelphia, PA, for Plaintiffs.

Mark J. Foley, Klett, Lieber, Rooney & Schorling, Philadelphia, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

This is a dispute between fourteen firemen and the various volunteer fire departments in the Township of Lower Merion that employ them over the fire departments' liability for overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA").

Plaintiffs, paid firefighters employed by five defendant fire companies, originally filed five separate actions, each naming one of the fire departments as a defendant. Because the individually-filed cases involved common questions of law, we consolidated them under the above caption for all purposes, pursuant to Fed.R.Civ.P. 42(a).

Defendants have moved for summary judgment, and the plaintiffs have moved for partial summary judgment. The motions distill into one discrete and close question of law, whether the defendant fire departments are agencies of the Township of Lower Merion. Because we hold they are not, we shall grant plaintiffs' motion and deny defendants'.

## I. Factual Background

The parties have submitted a set of stipulated facts and an appendix of exhibits, from which we have drawn the facts necessary to the following discussion. As will be seen, in order to appraise the parties' legal contentions under the FLSA, it is necessary to have a detailed understanding of these five fire companies and their relationship with the Township.

### A. Internal Structure of the Individual Fire Departments

Each of the defendant fire departments is a non-profit corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. Each was incorporated for the exclusive purpose of providing fire protection services to various areas within Lower Merion Township, and all began their existence as entirely volunteer organizations. None of the fire departments was incorporated by Lower Merion Township, Montgomery County, or the Commonwealth of Pennsylvania, *see* Stip. Exs. 6–10, and none of them has the power to levy taxes. Stip. No. 44.

The internal organization of these fire departments varies. All, however, share the common characteristic that the citizens of the respective areas have no role in the election of the governing boards of the departments. Stip. No. 43.

Specifically, defendant Union Fire Co., which was incorporated in 1903, is governed by a Board of Directors elected by the members of the fire department. The Board of Directors, in turn, elects the President of the company. The members of the company elect the Chief, who is the officer in charge of the actual firefighting and of the training of the firefighters. *See* Stip. Ex. 6 (By-laws of the Union Fire Co.).

Defendant Merion Fire Co., incorporated in 1890, is governed by a Board of Managers elected by the members of the department. The Board of Managers elects the President of the company, and the members of the Fire Brigade (those members of the company who are active firefighters) elect the Chief. *See* Stip. Ex. 7 at Article X (By-laws of Merion

Fire Co.). Defendants Gladwyne Fire Co., founded in 1944, and Penn Wynne Fire Co., founded in 1928, have similar organizations. *See* Stip. Ex. 8 (By-laws of Gladwyne Fire Co.) and Stip. Ex. 10 (By-laws of Penn Wynne Fire Co.).

The Belmont Hills Fire Co. also is governed by a Board of Directors, but the membership, rather than the Board, elects the President. *See* Stip. Ex. 9 (By-laws of Belmont Hills Fire Co.). The members also elect the Chief. *Id.*

## B. The Lower Merion Fire Department

The Lower Merion Township Board of Commissioners in 1908 established the Lower Merion Township Fire Department ("L.M.F.D."). Stip. ¶ 16. The purpose of the L.M.F.D. is to coordinate fire protection activities. Stip. ¶ 16. The Chief Fire Officer, a full-time paid employee of the Township, is the head of the L.M.F.D. Stip. at ¶ 18. The L.M.F.D. employs five other full-time Township employees, a Deputy Chief, three Deputy Fire Marshals, and a clerk. *See* Stip. Ex. 12 at 1st page. Other than these six employees, the L.M.F.D. does not employ any paid professional firefighters. Stip. ¶ 19.

The L.M.F.D. is governed, pursuant to the Township Fire Code, by a Board of Directors which consists of "the elected Presidents and Fire Chiefs of the volunteer Fire Companies, the Chairman of [the] Fire Committee of the Township's Board of Commissioners (the Township's elected council), the Township Manager and the Chief Fire officer." Stip. ¶ 21. The Board of Directors is directly responsible to the Township Board of Commissioners. *Id.* at ¶ 22.

## C. The Employment Relationship Between the Fire Departments and the Firefighters

Because there are often not enough volunteers to handle the equipment, the departments each employ three paid firefighters. These paid firefighters, known as "housemen," receive the same training as the volunteer firefighters, but perform additional tasks. Stip. ¶ 35. The housemen are responsible for maintenance of the fire equip-

ment and the fire house, and for driving the equipment. *See, e.g.,* Stip. Ex. 27 at Section V (Employee Policy and Procedural Manual of Union Fire Assoc.). The plaintiffs are current and former housemen in the five departments. *See* Stip. at ¶¶ 1–5.

Not one of the plaintiffs is, by virtue of his employment in the fire departments, an employee of the Township of Lower Merion, and Lower Merion does not employ any paid firefighters in the Lower Merion Fire Department. Stip. Nos. 19 & 42.

## D. The Relationship Between The Lower Merion Fire Department and the Fire Departments

Each of the five departments is a member of the L.M.F.D. Stip. at ¶ 17. The bylaws of the Lower Merion Fire Department and the Lower Merion Fire Prevention Code state that:

> Each volunteer fire company shall operate under its own bylaws, which shall be in accordance with generally accepted standards for similar organizations and with accounting procedures approved by the certified public accountants of the township. Nothing in this chapter is intended to restrict or hamper the internal organization of the volunteer fire companies.

Stip. Ex. 11 at p. 5.

The Township Fire Code requires each fire department, as a condition to receiving Township money, to submit a proposed budget, appropriation requests, quarterly reports, and budget reports to the Township Manager. Stip. ¶ 25; *see also* Stip. Ex. 11 at 6 ("Annual appropriations shall be made by the Board of Commissioners to each volunteer fire company in the township which is a member of the Fire Department, subject to such reasonable conditions as the Board of Commissioners may from time to time see fit to impose."). To date, each of the fire departments has complied with this requirement. *Id.* at 25. Each department must submit to an annual appraisal by Township auditors, the results of which are reported to the Township Board of Commissioners, and the Commissioners use the audit to deter-

mine the amount of each individual fire department's annual appropriation. Stip. ¶ 26.

As noted above, none of the housemen is, by virtue of his employment with a particular fire department, an employee of the Lower Merion Fire Department. However, "[t]ownship funds are used to pay the salaries of the volunteer fire companies' housemen. In addition, the Township directly reimburses the volunteer fire companies for the cost of providing workmen's compensation insurance for the housemen." Stip. ¶ 36.

The Township in 1966 "specifically required each volunteer fire company to add a third houseman and increased its annual appropriation to the individual volunteer fire companies to pay for the services of the additional houseman." Stip. ¶ 37. The Township also requires that each fire department, "under the direction of the Township Chief Fire Officer," train its firefighters. Stip. ¶ 23. One of the Deputy Fire Marshals, known as the Training Officer, who is a paid full-time Township employee, "provides oversight and assistance for each volunteer fire company's training program." Stip. ¶ 30.

The L.M.F.D. operates as a coordinating force among the departments, though it does not assume direct control over the actions of the fire fighters:

> Pursuant to the Township of Lower Merion Fire Code, the Chief Fire Officer of the Township shall respond to and assume command at all alarms and fires to which more than two volunteer member fire companies respond. The Chief Fire Officer shall also respond to and assume command when two fire companies have responded to a fire emergency, but only if conditions at the fire grounds make such action necessary to protect life and property. Until then, the Fire Chief of the volunteer fire company in which the fire occurs shall be in command. All orders issued by the Chief Fire Officer should be transmitted through the Fire Chief of the volunteer member fire company in whose district the fire occurs.[1]

Stip. ¶ 29. The by-laws of the L.M.F.D. provide that "[t]he Fire Chief and subordinate officers of each volunteer fire company shall be in command of their fire companies at fires. All fire companies shall adhere to uniform Fire Department procedures as recommended by the Board of Directors of the Fire Department and approved by the Board of Commissioners of the Township." Stip. Ex. 13 at 2 (By-laws of the L.M.F.D.). In addition, "[t]he Fire Chiefs and their subordinate officers shall be responsible for the maintenance, efficiency and conduct of their respective fire companies." *Id.* The L.M.F.D. by-laws also define each fire department's territory. Stip. ¶ 24.

The Township also "provides extensive technical support to the individual volunteer fire companies," and "assists in the operation of a Central Dispatch System which coordinates the responses of the volunteer fire companies to emergency calls." Stip. ¶ 30. The L.M.F.D. also establishes the standard operating procedures which the departments must follow at emergency scenes such as "command and control procedures, procedures for high-rise emergencies, fire training, health and safety, handling clandestine drug laboratories, responding to bomb threats, and operating vehicles." Stip. ¶ 27.

In 1996, the Township and the Commonwealth of Pennsylvania provided the bulk of the fire companies' operating funds. Specifically, Penn Wynne–Overbrook Hills Fire Co. received seventy-four percent of its 1996 revenues from these two sources, the Union Fire Association received sixty percent from them, the Merion Fire Company of Ardmore got sixty-five percent, the Belmont Hills Fire Company, eighty percent, and the Gladwyne Fire Company, sixty-six percent. Stip. ¶ 31. In addition:

> In March, 1995, Lower Merion Township began a program of providing funds to the volunteer Fire Companies for repairs to their fire houses.
>
> Under this policy, the Township has provided funding for repairs to the defen-

---

1. *See* Stip. Ex. 11 at 3 (Fire Prevention Code of the Township of Lower Merion) ("In the event that the Chief Fire Officer or Deputy Chief Fire Officer assumes command, all orders of the Chief Fire Officer or Deputy Chief Fire Officer should be transmitted through the Fire Chief or the subordinate officers of the volunteer member fire company in whose district the fire occurs.").

dants' fire houses. Currently, the Township has committed to funding the construction of a new fire house for the Merion Fire Company of Ardmore. The Township retains the right to enter the property if the Ardmore Company is unable to satisfy its obligations under the agreement.

The elected Board of Commissioners of the Township of Lower Merion have adopted a policy to provide funding to the individual Fire Companies for the purchase price of new fire equipment, such as pump and ladder trucks. Pursuant to this policy, the Township Commissioners review any requests for new equipment and then approve reimbursement to the individual volunteer fire company. Each company covenants that if it dissolves or ceases to be a member company of the Lower Merion Township Fire Department, then it must transfer ownership of any equipment purchased under the policy to the Township.

Stip. ¶¶ 32–34 (internal citations omitted).

### E. The Relationship Between The L.M.P.D. and the Individual Firefighters

Although the "hiring of paid firemen (housemen) [is] a company function" each fire department retains, the Lower Merion Board of Commissioners does possess the power to veto the hiring of an individual houseman if "in the opinion of the board, said individual would be incompetent or [ ] the character of said individual [is] determined to be of discredit to the Department or the Township." Stip. Ex. 13 at 8 (Bylaws of the Fire Department of the Township of Lower Merion).

* * *

It is important to note that we are not the first court to canvass the employment consequences of these fire departments' relationship to the Township. In the 1980s, the Township successfully defeated a unionization drive within the five departments. *See International Ass'n of Fire Fighters v. Commonwealth*, 95 Pa.Cmwlth. 93, 504 A.2d 422 (1986). In that case, the Commonwealth Court upheld an administrative finding that the Policemen or Firemen Collective Bargaining Act, 43 Pa. Cons.Stat. Ann. §§ 217.1– 217.10, which "controls collective bargaining between policemen and firemen and the Commonwealth or its political subdivisions", *Fire Fighters*, 504 A.2d at 423 n. 2, did not apply to the defendants' housemen because the Township was not a "joint employer" with the fire departments of the housemen.

The parallels of the *Fire Fighters* case to ours will become apparent in an extended excerpt from the Commonwealth Court's opinion.

Our review of the record discloses that the examiner's findings, which are supported by substantial evidence, uphold his conclusion that the Township is not a "joint employer." Each volunteer fire company has its own fire chief, president, board of directors and establishes its own internal house rules. The fire chiefs exert exclusive control over their companies' men at all fires. Each company owns its own equipment and fire houses. The wages, benefits and hours for the housemen are determined independently by each fire company. Holidays, sick leave and the entitlement to uniforms are controlled by each fire company. Finally, each fire company is responsible for and actually hires, disciplines and terminates its housemen.

In contrast, the Township's sole involvement with the fire companies is through its Fire Department, which coordinates a firefight when three or more companies are called and directs the work of the fire chiefs (not the individual volunteer firefighters). Economically, the Township appropriates lump sum monies for each fire company, provides statutorily mandated workman's compensation insurance for the housemen, and makes available Blue Cross/Blue Shield coverage to the housemen whose respective companies have requested it. Finally, the Township has the conditional authority to disapprove the hiring of a houseman.

We agree with the [Pennsylvania Labor Relations] Board that these peripheral contacts do not amount to any substantive authority or real control over the economic and conditional terms of employment for

the housemen at the individual volunteer fire companies.

*Fire Fighters,* 504 A.2d at 424–25 (internal citations and footnotes omitted).

## II. LEGAL ANALYSIS

### A. The Fair Labor Standards Act

Section 207(a) of the Fair Labor Standards Act provides the general rule for work hours and overtime pay under the statute. 29 U.S.C. § 207(a). Employers must pay their employees at the rate of one and one-half their hourly rate for every hour they work beyond forty hours in a week. 29 U.S.C. § 207(a). There is, however, a relevant exception to this rule, regarding public employees, which the defendants, in their motion, concisely and accurately summarize:

> The FLSA provides an exception to the overtime pay requirements of Section 207(a) for employees of public agencies that are engaged in fire protection activities. 29 U.S.C. § 207(k). Under Section 207(k), an employee engaged in fire protection activities is entitled to overtime pay after working the specified number of hours in a work period that ranges from 53 hours in a 7–day work period to 216 hours in a 28–day work period. For example, a fire department employing a 21–day work period would not be required to pay overtime to its employees until they had worked more than 159 hours in that 21–day work period. *See* 29 C.F.R. § 553.230 (providing maximum hours standard for employees engaged in fire protection activities). The purpose of this exception is to recognize the reality that employees engaged in fire protection activities are often "on call" 24–hours a day and rarely if ever follow the typical 40–hour work week model followed by most other employees.

Def. Br. at 13 (footnotes omitted).

### B. The History of Volunteer Fire Departments—Private organizations Providing Public Service

■ We begin with the premise that not every organization involved in firefighting is a government agency for purposes of the FLSA. The Department of Labor's regulation under the FLSA supports this premise:

"The application of [the § 207(k) exception], by [its] terms, is limited to public agencies, and does not apply to any private organization engaged in furnishing fire protection or law enforcement services. This is so even if the services are provided under contract with a public agency." 29 C.F.R. § 553.202 (1997). Thus, "[w]hile the money used to pay 'overtime' to the private firefighters might ultimately come out of the State's pocket, this does not make the private employer a 'public agency.'" *Conway v. Takoma Park V.F.D., Inc.,* 666 F.Supp. 786, 792 (D.Md. 1987), *appeal dismissed,* 838 F.2d 465 (4th Cir.1988).

Defendants claim that "the Fire Companies here are providing 'traditional government functions.'" Def. Br. at 18. While it is true that the Supreme Court has described fire prevention and fire protection as "typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services," *National League of Cities v. Usery,* 426 U.S. 833, 851, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976), *overruled on other grounds by Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), it is also true that in this country in general, and in this part of it in particular, a long history of nongovernmental, volunteer firefighting exists. This history in Philadelphia centers on its most famous citizen.

> Benjamin Franklin was foremost of all Philadelphia's exponents of fire prevention. In December of 1733 he published in his *Gazette* an article exhorting everyone to assist in extinguishing fires: "how pleasing must it be to a thinking Man to observe, that not a Fire happens in this Town, but soon after it is seen and cry'd out, the Place is crowded by active Men of different Ages, Professions and Titles; who, as of one Mind and Rank, apply themselves with all Vigilance and Resolution, according to their Abilities, to the hard Work of conquering the increasing Fire."

Now that the city had enough fire engines, Franklin realized that the weakness in its fire defenses lay in the disorganized, if earnest, efforts of her citizens. In an arti-

cle on fire prevention, published in the *Gazette* of January 28—February 4, 1734/5, and highlighted by the statement "an Ounce of Prevention is worth a Pound of Cure," Franklin notes, "As to our Conduct in the Affair of Extinguishing Fires, tho's we do not want Hands or Good-will, yet we seem to want Order and Method, and therefore I believe I cannot do better than to offer for our Imitation, the Example of a City in a Neighboring Province. There is, as I am well inform'd, a Club or Society of active Men belonging to each Fire Engine; whose Business is to attend all Fires with it whenever they happen." In his *Autobiography* Franklin records the reception which his article met with:

> This was much spoken of as a useful piece, and gave rise to a project, which soon followed it, of forming a company for the more ready extinguishing of fires, and mutual assistance in removing and securing of goods when in danger. Associates in this scheme were presently found, amounting to thirty. Our articles of agreement oblig'd every member to keep always in good order, and fit for use, a certain number of leather buckets, with strong bags and baskets (for packing and transporting of goods), which were to be brought to every fire; and we agreed to meet once a month to spend a social evening together, in discoursing and communicating such ideas as occurred to us upon the subject of fires, as might be useful in our conduct on such occasions.

> The utility of this institution soon appeared, and many more desiring to be admitted than we thought convenient for one company, they were advised to form another, which was accordingly done; and this went on, one new company being formed after another, till they became so numerous as to include most of the inhabitants who were men of property.... I question whether there is a city in the world better provided with the means of putting a stop to beginning conflagrations; and, in fact, since these institutions, the city has never lost by fire more than one or two houses at time.

Thus was formed on December 7, 1736, Philadelphia's first volunteer fire force, the Union Fire company.... The other companies, whose formation followed shortly after, were the Fellowship, 1738; the Hand–in–Hand, 1742; the Heart–in–Hand, 1743; the Friendship, 1747; .the Star, 1749; the Britannia, 1750 or 1751; and the Hibernia, 1752. Among them these eight companies owned an impressive amount of fire-fighting equipment.

Nicholas B. Wainwright, *A philadelphia Story* 19–21 (1952).[2]

Such private, volunteer organizations have played a large part in the development of our national character, as America's most observant foreign visitor noted forty-five years after Franklin's death.

> In no country in the world has the principle of association been more successfully used, or more unsparingly applied to a multitude of different objects, than in America. Besides the permanent associations which are established by law under the names of townships, cities, and counties, a vast number of others are formed and maintained by the agency of private individuals.

> The citizen of the United States is taught from his earliest infancy to rely upon his own exertions, in order to resist the evils and the difficulties of life; he looks upon the social authority with an eye of mistrust and anxiety, and he only claims its assistance when he is quite unable to shift without it.... The same spirit pervades every act of social life. If a stoppage occurs in a thoroughfare, and the circulation of the public is hindered, the neighbours immediately constitute a deliberative body; and this extemporaneous assembly gives rise to an executive power, which remedies the inconvenience, before anybody has thought of recurring to an

---

2. Wainwright's history bears the subtitle of another Franklin-founded institution, *The Philadelphia Contributionship for the Insurance of Houses from Loss by Fire*. The occasion of Wainwright's book was The Contributionship's bicentennial, and we are grateful to The Contributionship's Carol Smith for pointing us to this pertinent volume.

authority superior to that of the persons immediately concerned.

> ... Societies are formed to resist enemies which are exclusively of a moral nature, and to diminish the vice of intemperance: in the United States associations are established to promote public order, commerce, industry, morality, and religion; for there is no end which the human will, seconded by the collective exertions of individuals, despairs of attaining.

1 Alexis de Tocqueville, *Democracy in America* 177 (Henry Reeve trans., Arlington House 1966) (1835). Tocqueville five years later described this aspect of the American character as peculiar to the national spirit.

> The political associations which exist in the United States are only a single feature in the midst of the immense assemblage of associations in that country. Americans of all ages, all conditions, and all dispositions, constantly form associations. They have not only commercial and manufacturing companies, in which all take part, but associations of a thousand other kinds,—religious, moral, serious, futile, extensive or restricted, enormous or diminutive. The Americans make associations to give entertainments, to found establishments for education ... and in this manner they found hospitals, prisons, and schools. If it be proposed to advance some truth, or to foster some feeling by the encouragement of a great example, they form a society. Wherever, at the head of some new undertaking, you see the Government in France, or a man of rank in England, in the United States you will be sure to find an association.

> I met with several kinds of associations in America, of which I confess I had no previous notion; and I have often admired the extreme skill with which the inhabitants of the United States succeed in proposing a common object to the exertions of a great many men, and in getting them voluntarily to pursue it.

2 Alexis de Tocqueville, *Democracy in America* 114–15 (Henry Reeve trans., Arlington House 1966) (1840).

In some areas of this country, fire departments are not only not funded by the government, but rather are still funded by private subscription. These subscription fire depart-ments' firefighters will refuse to respond to a fire at a non-subscriber's property or will watch a non-subscriber's building burn to the ground. *See, e.g., Owners Uncertain After Store Fire*, Commercial Appeal (Memphis, Tenn.), September 14, 1994, at B2 ("The South Fulton Fire Department refused to send firefighters to the fire scene because [the owner of the destroyed building] is not a subscription member of the city's rural fire protection service"); *see also* Kim Eckart, *In the Line of Duty: Volunteer Firefighters Protect their Communities, But More Needs to be Done to Protect Them*, Idaho Statesman, August 22, 1995 ("The Garden Valley Rural Fire Department charges property owners $45 a year for fire protection.... That doesn't mean volunteers won't put out a fire on a non-subscriber's property. They'll go willingly and charge the non-subscriber at least $500 to do it.").

There is, in sum, no historical or current warrant for equating fire companies with public government.

### C. Are the Individual Fire Departments "Public Agencies" Under the FLSA?

#### 1. Relevant Authority

Two courts have expressly addressed the question presented in this case, to wit, whether a particular volunteer fire department is entitled to an exemption from the FLSA overtime pay requirements on the grounds that it is a public agency providing fire protection activities. *See Wilcox v. Terrytown Fifth Dist. V.F.D.*, 897 F.2d 765 (5th Cir.1990), *cert. denied*, 498 U.S. 900, 111 S.Ct. 256, 112 L.Ed.2d 214 (1990); *Conway, supra*, 666 F.Supp. 786.

In *Wilcox*, the Fifth Circuit affirmed the District Court's determination that the fire department in question was an agency of Jefferson Parish Louisiana. *Wilcox*, 897 F.2d at 767. In resolving this "close and very difficult question", *id.* at 765, the Court of Appeals focused on "whether the entity is directly responsible to public officials or to the general public and whether the parties' contracts designate them as state agencies rather than independent contractors." *Id.* at 767.

The factors which led the Fifth Circuit to its conclusion that the district court's holding

was correct were (1) Jefferson Parish organized the fire department in question, (2) the funding for the fire department came "almost exclusively" from "the proceeds of a millage tax imposed upon Jefferson Parish residents and by allocation of certain state tax dollars", (3) the close accounting procedures the Parish imposed upon the department,[3] and (4) the extent of the control the Jefferson Parish Council exercised over the Fire Department. *Id.* at 767–68.[4]

The District Court in *Conway* also weighed a number of factors in its analysis of whether the plaintiffs, "over four hundred fire and rescue service employees who work for various Montgomery County [Maryland] fire and rescue corporations" were employees

3. The Fire Department "must submit annual financial reports to the financial director of Jefferson Parish detailing how all public funds received by it were disbursed. In addition, the department must submit to the Parish its annual budget for fire protection services one year in advance, so that the Parish may budget for these costs." *Wilcox*, 897 F.2d at 767.

4. In addition to these factors, the Fifth Circuit also applied what can best be described as a *gestalt* test:

> We hold, not only that the district court made the proper inquiry, but that it reached the proper result. First, the result, on its face, appears patently correct. A fire department is, in a sense, the archtypical [*sic*] public agency; further, it is exactly the type of agency to which § 207(k) is specifically directed.

*Wilcox*, 897 F.2d at 767. While we agree that fire departments perform a vital public service, to conclude that a fire department is a public agency because it is the "archetype" of public agencies seems to us to beg the question rather than to illuminate the proper result.

5. The defendants go to great lengths to convince us that *Conway* erred in its analysis of whether the defendant fire departments were public agencies under the FLSA:

> The Fifth Circuit distinguished the decision reached by the district court in *Conway v. Takoma Park Volunteer Fire Department*, 666 F.Supp. 786 (D.Md.1987), *appeal dismissed*, 838 F.2d 465 (4th Cir.1988). That decision also involved an interpretation of the FLSA as applied to paid employees of a private volunteer fire company. In *Conway*, the court applied the National Labor Relations Act ("NLRA") definition of "political subdivision" to the volunteer fire department to determine if the department was a public agency for the purposes of the FLSA. The *Conway* court's underlying assumption in doing so was that:

of public agencies. *Conway*, 666 F.Supp. at 789. The Court looked "at the way courts have approached the same issue in the context of another federal labor statute, the NLRA [National Labor Relations Act, 29 U.S.C. § 152(2) ]; [gave] weight to the [Department of Labor's] opinion; [ ] look[ed] to congressional intent behind the FLSA; and [ ] look[ed] at the position taken by Montgomery County itself on the issue of whether plaintiffs are County employees." *Id.* at 793.[5]

## 2. Applicability of the § 207(k) Exemption to these Fire Departments

When we examine the relationship between the fire departments and the Lower

> ... Congress used similar terminology in each statute to describe those entities to which the exemptions would apply: "public agency" and "political subdivision." The court believes that it is appropriate to use the analysis developed in NLRA cases to determine when an organization qualifies as a "political subdivision" under the FLSA so as to be relieved of certain obligations.

*Id.* at 793. The basic assumption of the court in *Conway, supra*, is incorrect. The NLRA does not refer to "any agency of ... a political subdivision" in its exemption of the government from its provisions. *See* 29 U.S.C. § 152(2). It simply exempts "any State or political subdivision thereof." On the other hand, the language of the FLSA exempts not only "a State or political subdivision thereof" but also "any agency of ... the State or a political subdivision of a State." *Id.* § 207(k). The exemption under the FLSA, therefore, is clearly broader than the exemption under the NLRA. To construe the § 203(x) public agency definition to only include the "State or political subdivision thereof". as written in the NLRA completely ignores the remaining language of the section classifying an "agency" of the State or political subdivision as a public agency.

Defs. Br. at 17 n. 9.

Upon a careful reading of *Conway*, however, we are at a loss to determine how the test *Conway* imported from NLRA jurisprudence, "whether [the fire department] is administered by individuals who are responsible to public officials or to the general electorate," *Conway*, 666 F.Supp. at 794, is any different from one of the tests defendants urge us to adopt in their brief— "another key factor in determining whether a private party should be considered an agency of a political subdivision for purposes of the FLSA is whether the entity is directly responsible to public officials or to the general public." Defs. Br. at 22. While *Conway*'s application of this test to the facts of its case led to a result with

Merion Township Fire Department under both *Wilcox* and *Conway*, we find that these fire departments are *not* public agencies under the FLSA.

### a. These Fire Departments are Not Public Agencies Under the *Wilcox* Analysis

■ Looking at these fire departments through what we regard as the acute lens of *Wilcox*, we find that these fire departments are separate private corporations, founded by public-spirited private citizens. Although the fire departments receive much of their funding from the Township and the Commonwealth, this is not dispositive. *See* 29 C.F.R. § 553.202 (1997) ("The application of [the § 207(k) exception], by [its] terms, is limited to public agencies, and does not apply to any private organization engaged in furnishing fire protection or law enforcement services. This is so even if the services are provided under contract with a public agency."). We cannot say that the fire departments are funded "almost exclusively" by tax monies, although even if they were, that would not determine this "close and very difficult question." *Wilcox*, 897 F.2d 765.

It is true that, as did Jefferson Parish in *Wilcox*, the Township of Lower Merion does audit each fire departments' operations by requiring each, as a condition to receiving Township money, to submit a proposed budget, appropriation requests, quarterly reports, and budget reports to the Township Manager. Stip. ¶ 25; *see also* Stip. Ex. 11 at 6 ("Annual appropriations shall be made by the Board of Commissioners to each volunteer fire company in the township which is a member of the Fire Department, subject to such reasonable conditions as the Board of

Commissioners may from time to time see fit to impose.") And although each department must submit to an annual appraisal by Township auditors, the results of which the Commissioners use to determine the amount of each fire department's annual appropriation, Stip. ¶ 26, this by no means resolves our inquiry, since it merely shows a conditional grant of money, and not a parent-subsidiary relationship.

■ Our final inquiry under *Wilcox* is "whether the entity is directly responsible to public officials or to the general public." *Wilcox*, 897 F.2d at 767. Although the defendants would have us resolve the question of these fire departments' status by examining the make up of the Board of the L.M.F.D., *see* Defs. Br. at 22, we find that the proper inquiry is rather to what extent the members of the governing board of each fire department are responsible to the general public.

We reach this conclusion because of the relatively non-intrusive nature of the Lower Merion Fire Department's relationship with the five fire departments. When we compare the relatively modest coordinating role which the Lower Merion Fire Department and the Township of Lower Merion exercise in relation to the fire departments [6] with the far more intrusive powers of Jefferson Parish and the local fire board in *Wilcox*,[7] it is apparent that the two municipalities' roles in the operations of the respective volunteer fire departments are quite different in scope. As the parties have stipulated that the governing boards of the these departments are *not* elected by the public, nor are they appointed by a public official—but rather are selected by the members of each depart-

---

which the present defendants disagree, it appears that the defendants have raised a false alarm.

**6.** *See* Section I.D., *supra* pp. 5–9.

**7.** *Wilcox* described the relationship as:
The Fire Department performs its firefighting services pursuant to an agreement between it and Fire Protection District No. 5. The contract specifically provides that the governing authority of the Fire Protection District No. 5 is the Jefferson Parish Council. Under the terms of the contract, the Fire Department must comply with all reasonable recommendations made by the agencies appointed by the

Parish Council, (Jefferson Parish Department of Fire and Emergency Services and The Property Insurance Association of Louisiana), or it must show cause at a hearing held before the Jefferson Parish Council why it cannot. Although the Jefferson Parish Council does not directly control the daily activities of the Fire Department, it is clear from the contractual agreement that the Council has the ultimate power and authority over the activities of the Fire Department.
897 F.2d at 767–68.

ment—we find that these entities are not directly responsible to the general public nor to a public official.

### b. These Fire Departments are Not Public Agencies Under the *Conway* Analysis

When we examine the relationship between the Township, the L.M.F.D., and these fire departments using the criteria enunciated in *Conway,* we are fortified in our conclusion that they are not public agencies under the FLSA.

As a preliminary matter, the United States Supreme Court has held that we should interpret the FLSA liberally, "to apply to the furthest reaches consistent with congressional direction," while we should construe any exception to coverage under the FLSA narrowly. *Tony & Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 296, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985); *Powell v. United States Cartridge Co.,* 339 U.S. 497, 516–17, 70 S.Ct. 755, 765–66, 94 L.Ed. 1017 (1950).

We have already analyzed whether and to what extent the fire departments are "administered by individuals who are responsible to public officials or to the general electorate." *Conway,* 666 F.Supp. at 794. It is instructive on this point to compare the makeup of the boards of the fire departments in this case, none of which have members elected by the public, to the boards of the fire departments in *Conway,* some of which did include members elected by the general public. *See Conway,* 666 F.Supp. at 794–95.

Finally, we cannot ignore the position of the Township of Lower Merion—which, as defendants correctly note, is not a party to this action [8]—on the question of whether the firemen who work for these fire departments are employees of the Township. *Conway,* 666 F.Supp. at 795–96. As we explained above at pp. 319–320, the Township of Lower Merion fought a long and successful battle to prevent the firemen in these very fire departments from unionizing. *See International Ass'n. of Fire Fighters v. Commonwealth,* 95 Pa.Cmwlth. 93, 504 A.2d 422 (1986). The Township in that litigation won from the Pennsylvania courts a holding that it was not an employer of these housemen. *Id.* Though we do not today hold that the defendants in this case are precluded from arguing that the Township's position in *Fire Fighters* is incorrect or that the state court's holding is inapplicable (or that the Township's position in that case is distinguishable), we do find that the Township's position gives us some indication of the economic realities of this employment dispute, *see Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936–37, 6 L.Ed.2d 100 (1961), and that the realities of that position in no way undercut our determination that these fire departments are not public agencies under the FLSA.

We therefore hold that the five fire departments are not "public agencies" under § 207(k) of the Fair Labor Standards Act, and we shall grant the plaintiffs' motion for partial summary judgment, and deny the defendants' motion for summary judgment. An appropriate Order follows.[9]

### *ORDER*

AND NOW, this 5th day of August, 1997, upon consideration of defendants' motion for summary judgment, plaintiffs' motion for partial summary judgment, and defendants' reply brief, and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motion for summary judgment is DENIED;

2. Plaintiffs' motion for partial summary judgment is GRANTED; and

3. The parties shall, by noon on August 15, 1997, submit a stipulation setting forth

---

8. Montgomery County Maryland was not a party to the *Conway* case. *See Conway,* 666 F.Supp. at 789 (noting the defendants' motion, pursuant to Fed.R.Civ.P. 19 (which the court rejected), to join Montgomery County as an indispensable party).

9. All that now remains before entering final judgment is to liquidate the individual plaintiffs' dollar entitlements from the particular defendant fire companies. As this should be a mere arithmetic exercise, we trust the parties should have no difficulty submitting an appropriate stipulation in ten days.

the sums due each plaintiff from the defendant who employed him, as calculated in accordance with the Fair Labor Standards Act and the foregoing memorandum, and shall deliver or fax courtesy copies thereof to Chambers (Room 5918).